**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL SEAN CRONICAN, | ) | CASE NO. 1:25-CV-638 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Michael Sean Cronican's application for a period of disability and Disability Insurance Benefits (DIB). Mr. Cronican seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated April 1, 2025.)

For the reasons set forth below, I RECOMMEND that the Court REVERSE the Commissioner's decision and REMAND this matter for further proceedings consistent with this Report and Recommendation.

## II.      PROCEDURAL HISTORY

In September 2022, Mr. Cronican applied to the Social Security Administration (SSA) seeking a period of disability and DIB benefits; he claimed that he became disabled on March 1, 2021. (Tr. 287, 289.)[2] He identified six allegedly disabling conditions: (1) lumbar degenerative

---

[1] Leland Dudek was serving as Acting Commissioner of Social Security when the complaint was filed. He served in that role until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] The amended administrative transcript appears at ECF No. 11. The agency filed an amended transcript because its initial transcript had included a small set of records irrelevant to Mr. Cronican's claim. I will refer to pages within the amended transcript by identifying the Bates number printed on the bottom right-

disc disease; (2) obstructive sleep apnea; (3) morbid obesity (BMI 50+); (4) insomnia; (5) post-traumatic stress disorder; and (6) anxiety disorder with panic attacks. (Tr. 319.)

The SSA denied Mr. Cronican's application initially and upon reconsideration. (Tr. 207–08, 217–18.) Mr. Cronican requested a hearing before an administrative law judge (ALJ). (Tr. 235.) The ALJ held a hearing on January 24, 2024, at which Mr. Cronican was represented by counsel. (Tr. 169–99.) Mr. Cronican testified, as did an independent vocational expert (VE). (*Id.*)

On February 14, 2024, the ALJ issued a written decision finding that Mr. Cronican is not disabled. (Tr. 151–64.)

Mr. Cronican requested review of the ALJ's decision. (Tr. 281–82.) His counsel submitted a brief setting forth arguments on appeal, primarily focused on his mental conditions. (Tr. 387–90.) His counsel argued that the ALJ erred in finding his mental health conditions to be non-severe and, further, argued that "[i]f his case had proceeded to step 5, he would have been found disabled per the VE testimony, which stated that an individual weighing more than 300 pounds would require an accommodation in the form of a bariatric chair." (Tr. 282.)

On February 20, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On April 1, 2025, Mr. Cronican filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Cronican asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ's RFC finding is not supported by substantial evidence because it did not accurately reflect Plaintiff's need for a bariatric chair.

---

hand corner of the page (e.g., "Tr. 164"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 771").

**Second Assignment of Error:** The ALJ's RFC finding is not supported by substantial evidence because the ALJ's rationale for discounting Plaintiff's symptom allegations did not comport with apposite regulations and case law.

(Pl.'s Merit Br. at 8, 10, ECF No. 7, PageID# 771, 773.)

## III.    BACKGROUND[3]

### A.    <u>Personal, Educational, and Vocational Experience</u>

Mr. Cronican was born in February 1979 and was 43 years old on the date of his application. (Tr. 284.) He graduated high school and completed occupational training to be a security officer. (Tr. 320.) He previously worked for various security companies as a guard and, in one instance, as an office manager. (Tr. 175–81.) He has driven for rideshare companies, and he has worked as a customer service representative for an insurance company. (Tr. 183; *see also* Tr. 308.)

### B.    <u>Function Report</u>

Mr. Cronican completed a function report in October 2022. (Tr. 331–38.) He wrote that he cannot stand or walk for longer than 15 minutes without experiencing back pain. (Tr. 331.) He cannot bend over to pick things up off the floor. (*Id.*) He cannot sit upright for longer than a half hour. (*Id.*) And he said he has anxiety "dealing with people," "particularly people with extreme emotions." (*Id.*)

---

[3] During the administrative proceedings, Mr. Cronican alleged that he was disabled as a result of both physical and mental conditions. In this proceeding, he challenges the ALJ's analysis only with respect to his physical conditions. I therefore focus my summary on the evidence relevant to his physical conditions and limitations. I note that there are a number of therapy records from 2020 and 2021 in the administrative transcript; I have reviewed them, but they are not summarized here as neither party relies on them in this proceeding. (Tr. 394, 396, 399, 402, 405, 408, 411, 414, 417, 420, 423, 426, 429, 432, 435, 438, 441, 444, 447, 450, 453, 456, 459, 462, 466, 469, 472, 475, 478, 481, 484, 487, 490, 493, 496, 498, 500, 503, 505, 507, 509, 511, 513, 515, 517, 519, 521, 523, 525, 527, 529, 531, 533, 536, 539, 541, 543, 547.)

Mr. Cronican described a typical day, in which he takes his medicine after waking up, then stretches his back, then watches television until falling asleep. (Tr. 332.) He wrote that he attends physical therapy twice a week for back pain. (*Id.*) Although his wife primarily takes care of their pets, he is able to feed them and take them for brief walks twice a week. (*Id.*)

Mr. Cronican said that he experiences insomnia, discomfort, regular "spikes" of pain, and difficulty with mobility after he wakes up. (*Id.*) He needs assistance dressing himself (pants and footwear) and bathing, and he has difficulty with aspects of toileting. (*Id.*)

He is able to cook food every day that is "easy to microwave" or prepare in an air fryer, but using the oven causes him pain. (Tr. 333.) He is not able to complete household chores, bend over, reach, or lift. (*Id.*) He is able to drive. (Tr. 334.) He is able to shop once a month for "essentials." (*Id.*) He interacts with others over online gaming daily. (Tr. 335.) He does not socialize in person outside the home anymore. (*Id.*)

Mr. Cronican estimated that he can walk for 100 yards before needing to stop and rest for between five and twenty minutes. (Tr. 336.) He uses a cane rarely, after a "bad night of back pain." (Tr. 337.)

### C. **Relevant Hearing Testimony**

#### *1. Mr. Cronican's Testimony*

Mr. Cronican testified that he had been working as a customer service representative for an insurance company until 2021, when he had a "mental break" due to anxiety. (Tr. 184.) He described having difficulty dealing with angry callers who would scream and use abusive language with him. (Tr. 186.) He left the company at that time and has not worked substantially since. (Tr. 184–85.)

When asked to identify why he feels that he is unable to work, Mr. Cronican responded that "[m]ostly the issue is mental." (Tr. 185.) He described that he experiences significant anxiety

4

interacting with people in public, "particularly people who are emotionally explosive." (*Id.*) He also experiences anxiety while driving, ever since being in a car accident. (*Id.*) And he has back pain. (*Id.*) Mr. Cronican testified that he is "wildly unreliable" as a result of this anxiety, depression, and "sometimes" back trouble. (Tr. 185–86.)

Mr. Cronican takes three medications for anxiety. (Tr. 187–88.) He had been attending therapy but stopped because he could not afford to continue that treatment. (Tr. 188.)

With respect to his physical conditions, Mr. Cronican testified that he will sometimes plan to clean but will "wake up and today's the day my back doesn't want to work." (Tr. 186.) He said he had a consistent pain, which he described as "like an extreme fatigue reaction," in his lower spine. (Tr. 188.) The pain radiates up his back. (*Id.*) He does regular stretching throughout the day to manage his symptoms. (Tr. 189.) His pain is triggered by bending and reaching, and he has noticed that dishwashing and laundry are hard for him. (*Id.*) Sometimes even sitting can be difficult. (*Id.*) He can sit in a power recliner for about an hour, but he cannot sit for longer than 10 minutes in normal office, kitchen, or living room chairs. (Tr. 190.)

Mr. Cronican testified that he can only stand for 15 or 20 minutes at a time before needing to rest for 20 to 30 minutes. (Tr. 189.) He uses wedge pillows to help him sleep in a "semi-sitting position" and he on occasion (but "rarely") he "overdo[es]" his back and has to use canes because his balance and stamina are especially poor. (Tr. 190–91.)

Mr. Cronican testified that he weighs 490 pounds, a weight that has been pretty stable for him. (Tr. 191.) He has weighed more than 440 pounds for at least ten years. (*Id.*) He participated in a bariatric program for a year and a half, but he stopped attending because of his anxiety. (Tr. 192.) He lost 150 pounds through the program, but his treating professionals still declined to move him forward to bariatric surgery. (*Id.*)

Mr. Cronican's wife will prepare meals and wash dishes, and standing over the stove or the sink is "agony" for his back. (*Id.*) He has difficulty bathing and using the restroom; he tends to take short showers focusing on only one part of his body at a time. (Tr. 193.) He is able to shop for groceries, including walking around the store, but he makes short trips to pick up only one or two items at a time. (*Id.*)

### 2.  *Vocational Expert's Testimony*

Sarah Holmes testified as a vocation expert ("VE") at the hearing. (Tr. 193.) The VE categorized Mr. Cronican's past work as that of a security guard (DOT 372.667-034), a keep guard (DOT 372.167-014), and—his position with the insurance company—a policyholder information clerk (DOT 249.262-010). (Tr. 194.)

The ALJ asked the VE to assume that a hypothetical individual would be able to lift and carry 10 pounds frequently and 20 pounds occasionally. (*Id.*) The person could stand or walk for six hours out of an eight-hour workday. (*Id.*) The person could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs. (*Id.*) The person could frequently balance but only occasionally stoop, kneel, crouch, or crawl. (*Id.*) The person has no mental limitations but should avoid work in unprotected heights or around or operating dangerous moving equipment. (Tr. 194–95.) The VE testified that such a person could perform Mr. Cronican's past relevant work as a policyholder information clerk. (Tr. 195.)

The ALJ next asked the VE to assume that the hypothetical person was limited to standing and walking up to four hours per workday. (*Id.*) The VE confirmed that such a person could perform the work of a policyholder information clerk and could also perform the work of an information clerk (DOT 237.367-018), mail clerk (DOT 209.687-026), or office helper (DOT 239.567-010). (Tr. 195–96.)

Finally, the ALJ asked the VE to further limit the hypothetical individual to work at the sedentary exertion level, standing and walking up to two hours per workday. (Tr. 196.) The VE testified that such a person could perform the work of a policyholder information clerk, an order clerk (DOT 209.567-014), a circuit board assembler (DOT 726.684-110), or a sorter (DOT 521.687-086). (*Id.*)

In response to questions from Mr. Cronican's counsel, the VE testified that if the hypothetical person from the last of the ALJ's hypothetical questions was further limited to only occasional interaction with coworkers, supervisors, and the general public, the person could not perform the work of a policyholder information clerk but could still perform the work of an order clerk, circuit board assembler, or sorter. (Tr. 197.)

In response to further questions from counsel, the VE testified that a standard office chair can support up to 300 pounds. (*Id.*) If a hypothetical person required a heavy-duty chair capable of supporting up to 500 pounds, "[t]hat would be an accommodation." (Tr. 197–98.)

The VE testified that employers tolerate an employee being off task up to 15 percent of the workday and absent once or twice per month (but no more than six to eight times per year). (Tr. 198.)

### D.    State Agency Consultants

A disability examiner (Victoria Scott), a physician (Bruce Hallmann, M.D.), and a psychologist (Michelle Hoy-Watkins, Psy.D.) reviewed Mr. Cronican's claim at the initial review level. (Tr. 200–08.) Dr. Hoy-Watkins opined that Mr. Cronican's mental health conditions were not severe, reasoning that he had only mild impairments with respect to his ability to interact with others; to concentrate, persist, or maintain pace; and to adapt and manage himself. (Tr. 203.)

Dr. Hallmann opined that Mr. Cronican could frequently lift and carry items up to 10 pounds, and occasionally do so for objects up to 20 pounds; his ability to push and pull was

otherwise unlimited. (Tr. 204.) He could stand and walk for six hours and sit for six hours out of an eight-hour workday. (Tr. 204–05.) He should never climb ladders, ropes, or scaffolds, but could frequently balance and occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (Tr. 205.) He should avoid all exposure to unprotected heights and dangerous machinery, but otherwise had no environmental limitations. (*Id.*)

The agency consultants determined that Mr. Cronican retained the ability to perform light work, such as that required of an "automatic car wash attendant" (DOT 915.667-010), "folder, laundry" (DOT 369.687-018), or "photocopying machine operator" (DOT 207.685-018). (Tr. 206.) They therefore found that he was not disabled. (Tr. 207.)

In a letter to Mr. Cronican explaining its decision, the Agency wrote that the evidence shows that he experiences some pain and discomfort but is "still able to move [his] hands, arms, legs, and back in order to perform a variety of less strenuous, work-related activities." (Tr. 229.)

A disability examiner (Julie Greenwood), physician (W. Scott Bolz, M.D.), and psychologist (Robert Baker, Ph.D.) reviewed Mr. Cronican's claim at the reconsideration level. (Tr. 209–18.) Dr. Baker affirmed the initial determination that Mr. Cronican's mental conditions were not severe, finding it consistent with and supported by the medical evidence. (Tr. 212.) He further explained that the evidence indicates that his symptoms result in "no more than mild limitations." (*Id.*)

Dr. Bolz also affirmed the prior administrative medical findings and residual functional capacity, concluding that they were consistent with and supported by the medical evidence. (Tr. 215.)

Based on these conclusions, the agency consultants agreed that Mr. Cronican could perform the work of an automatic car wash attendant, laundry folder, or photocopying machine operator, and found him not disabled. (Tr. 216–17.)

In a letter to Mr. Cronican explaining this decision, the Agency wrote that his conditions are severe and result in significant limitations, but that he remains capable of light activity. (Tr. 234.)

### E.     Relevant Medical Evidence

Hospital records show that Mr. Cronican weighed 538 pounds in October 2019; his BMI was 69.7. (Tr. 14, 44.)

Mr. Cronican consulted with Timothy Golemgeski, M.D., in a telephone appointment on March 24, 2020. (Tr. 634.) He complained of intermittent back pain and said that he cannot sit or stand for too long; he also reported that his work could not accommodate a chair or desk for him. (Tr. 635.) He said that he had lost more than 80 pounds with a goal of obtaining bariatric surgery. (*Id.*) Dr. Golemgeski noted that Mr. Cronican would "benefit from a formal weight loss program." (Tr. 636.)

Mr. Cronican followed up with Dr. Golemgeski by telephone on April 13, 2020. (Tr. 631.) He reported that he had historically had no problems working, but "over the past week has been having [a] hard time getting through work" because of anxiety. (*Id.*)

Mr. Cronican's next telephone appointment with Dr. Golemgeski occurred on May 11, 2020. (Tr. 627.) He said that he felt that he should be doing better since losing weight, but he was still struggling with attention and "g[e]tting through the day." (Tr. 628.) He reported that he weighed 480 pounds. (*Id.*) That weight was not materially different at his next telephone appointment on May 22, 2020. (Tr. 625.)

9

Mr. Cronican reported his weight as 470 pounds on a telephone appointment with Dr. Golemgeski on July 7, 2020. (Tr. 620.)

Mr. Cronican participated in a weight and diet consultation with dietician Alexis Supan and Aviv Ben-Meir, M.D., on September 17, 2020. (Tr. 618.) He reported participating in martial arts "almost daily." (*Id.*) Dr. Ben-Meir noted that Mr. Cronican weighed 454 pounds, a decrease of 16 pounds from his starting weight. (*Id.*)

Mr. Cronican consulted with Kelly Manger, M.D., on November 22, 2021. (Tr. 600.) He complained of increased anxiety and depression, which he attributed to starting a new job. (Tr. 601.) The clinic measured his weight at 505 pounds. (Tr. 602.)

His weight was relatively unchanged in March 2022. (Tr. 593 (498 pounds)).

Mr. Cronican complained of groin pain, back pain, and leg pain while sitting and standing at an appointment in June 2022. (Tr. 588.) His weight was measured at 490 pounds. (Tr. 589.)

X-ray imaging of the spine in July 2020 revealed degenerative disc disease at the L5 to S1 level. (Tr. 638.)

Mr. Cronican was evaluated for physical therapy on August 10, 2022. (Tr. 678.) The therapist noted some limited range of motion and tenderness on examination. (Tr. 679.) The therapist further noted significant weakness and opined that Mr. Cronican would benefit from physical therapy. (Tr. 680.)

Mr. Cronican consulted by telephone with Angela Brinkman, D.O., on August 12, 2022. (Tr. 585.) He complained of back pain, insomnia, and anxiety. (Tr. 585–86.)

Mr. Cronican continued with physical therapy through the beginning of 2023. Treatment notes throughout 2022 reflect that Mr. Cronican continued to report back pain, anxiety, and trouble

sleeping, with severity fluctuating significantly from appointment to appointment; his back pain trended toward improvement over time. (Tr. 668–70, 671–77.)

Mr. Cronican consulted with Dr. Brinkman on September 1, 2022. (Tr. 581.) He complained of experiencing pain "with everything he does." (Tr. 582.) He said his back fatigues easily and he has pain radiating to the left groin, left leg, and back. (*Id.*) He continued to complain of anxiety and trouble sleeping. (*Id.*) His weight was reported as 498 pounds. (*Id.*)

Mr. Cronican was referred to Andrew Greunzel, M.D., with whom he met on October 7, 2022. (Tr. 557.) Mr. Cronican said that he hoped to decrease his pain in order to do housework and sleep better. (*Id.*) Dr. Greunzel noted that Mr. Cronican was not treating with anyone regarding weight loss and "appear[ed] somewhat against" weight loss surgery. (*Id.*) He weighed 490 pounds at the appointment. (Tr. 559.)

Mr. Cronican consulted with Kelly McPhillips, M.D., on January 25, 2023. (Tr. 691.) He reported "good control" of his depression symptoms but said he continued to experience insomnia. (Tr. 692.)

Mr. Cronican underwent a psychological evaluation with Hugh Turner, Psy.D., on February 16, 2023. (Tr. 652.) Dr. Turner noted that Mr. Cronican, despite his weight, had no difficulty ambulating in the office and maintaining appropriate posture while sitting for the interview. (Tr. 655.)

At a physical therapy appointment on February 22, 2023, Mr. Cronican reported significant improvement. (Tr. 667.) He said his weight was down to 470 pounds. (*Id.*) The therapist noted good progress with improved function, strength, and mobility. (*Id.*) He reported low back pain at his next appointment on February 27, 2023. (Tr. 666.)

Mr. Cronican consulted with Dr. McPhillips on May 16, 2023. (Tr. 688.) He complained of worsening insomnia. (Tr. 689.) His weight was recorded at 478 pounds. (*Id.*)

Mr. Cronican consulted with Dr. McPhillips again on December 5, 2023. (Tr. 739.) His weight was recorded at 491 pounds. (Tr. 741.)

## IV.    THE ALJ'S DECISION

The ALJ determined that Mr. Cronican met the insured-status requirements of the Social Security Act through December 31, 2024, and has not engaged in substantial gainful activity since March 1, 2021 (the alleged disability onset date). (Tr. 156.)

The ALJ next determined that Mr. Cronican had the following severe impairments: (1) morbid obesity; (2) degenerative disc disease of the lumbar spine; and (3) osteoarthritis. (Tr. 157.)

The ALJ also noted that Mr. Cronican had non-severe impairments of depression and anxiety. (Tr. 158.)

The ALJ determined that none of Mr. Cronican's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Cronican had the residual functional capacity ("RFC") to perform light work with a number of additional limitations. (Tr. 159.) Specifically, Mr. Cronican was limited to standing or walking for only four hours out of an eight-hour workday. (*Id.*) He can never climb ladders, ropes, or scaffolds, and he can only occasionally climb ramps and stairs. (*Id.*) He can frequently balance and occasionally stoop, kneel, crouch, or crawl. (*Id.*) He must avoid work in unprotected heights and work around or operating dangerous moving equipment. (*Id.*)

The ALJ determined that Mr. Cronican remained capable of performing his past relevant work as a policy holder information clerk (DOT 249.262-010). (Tr. 162–63.)

The ALJ further determined that—considering Mr. Cronican's age, education, work experience, and RFC—there were additional jobs that existed in significant numbers in the national economy that he could perform, including work as an "information clerk" (DOT 237.367-018), "mail clerk" (DOT 209.687-026), or "office helper" (DOT 239.567-010). (Tr. 164.) Accordingly, the ALJ determined that Mr. Cronican is not disabled. (*Id.*)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards.

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.      Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

C.     **Analysis**

Mr. Cronican raises two assignments of error in this administrative appeal. Because I agree with him with respect to the first assignment of error, I need not reach a consideration of the second.

In his first assignment of error, Mr. Cronican argues that the ALJ erred when crafting the RFC because the ALJ failed to include a limitation that Mr. Cronican would need a bariatric chair supporting his weight and because the ALJ failed to explain why she did not include such a limitation. Mr. Cronican points out that the ALJ identified morbid obesity as a severe impairment at Step Two and found that the evidence established that he weighed upwards of 470 pounds. He further points out that the VE testified that standard office chairs support only up to 300 pounds and that a bariatric chair would be an accommodation.

The Commissioner defends the ALJ's decision, arguing that a claimant does not meet their burden to establish a limitation merely by presenting evidence of their significant weight. The Commissioner would require that a claimant present a medical opinion or vocational evidence establishing that the claimant needs a bariatric chair.

While the Commissioner's argument is understandable in light of several court opinions from this Court that are discussed in detail further below, it is unreasonably severe and—ultimately—unsupported. In plain terms, this appeal presents the question:  Does it take an expert's opinion to know that a 500-pound man cannot use a chair that is only able to hold a 300-pound man? No, it does not. And in light of the evidence presented and the testimony of the VE in this case, remand is appropriate for the ALJ to further consider and explain whether Mr. Cronican requires a bariatric chair and, if so, the effect of such a limitation on the jobs that may be available to him.

My analysis starts with the ALJ's decision. The ALJ found morbid obesity to be a severe impairment, but—beyond noting Mr. Cronican's weight—the ALJ did not significantly discuss any limitations stemming from that obesity when crafting the RFC:

> The record also shows obesity. Claimant weight ranged from 505.2 pounds in November 2021 to 490 pounds with BMI 68.33 in June 2022. Claimant weighed 478 pounds in May 2023 and 491 pounds in December 2023. . . . Claimant is limited to light exertion with standing/walking for 4 hours in an 8-hour day due to pain and obesity.

(Tr. 161) (internal citations omitted).

This limited discussion was so despite the VE's hearing testimony that a standard office chair can only support up to 300 pounds and that providing a heavy-duty chair capable of holding up to 500 pounds would be considered an accommodation. (Tr. 197–98.) I further note that medical records reflect that, on one occasion, Mr. Cronican complained to his treating physician that his work could not accommodate a chair or desk for him. (*See* Tr. 635.)

It is true, of course, that "[a]n administrative law judge is only required to include in the residual functional capacity those limitations he finds credible and supported by the record." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). And, as discussed above, the standard for substantial evidence is not high. *E.g.*, *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019)

But, after careful consideration, I am convinced that the ALJ here did "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). While no doctor specifically opined that Mr. Cronican was limited to using a bariatric chair on account of his weight, the VE's testimony and the evidence establishing Mr. Cronican's consistent weight clearly raises the question of whether Mr. Cronican is so limited.

Agency regulations state that ALJs will assess a claimant's RFC "based on all of the relevant medical *and other evidence*" in the record. 20 C.F.R. § 404.1545(a)(3) (emphasis added).

Because the ALJ did not mention this evidence or address the issue of whether Mr. Cronican needs a bariatric chair, this is a situation where the Court cannot determine if the evidence was discounted or merely overlooked. *See Jordan v. Comm'r of Soc. Sec.*, No. 5:25-cv-964-JRA, 2025 WL 3237489, *10–12 (N.D. Ohio Nov. 20, 2025) (report and recommendation pending review).

The cases the Commissioner cites for the proposition that a medical opinion was required are distinguishable. In *Innocent v. Saul*, the claimant established only that he weighed 600 pounds; he did not offer any evidence establishing the weight that a standard work chair could hold. *Innocent*, No. 1:18-CV-2391, 2020 WL 1031531, at *11 (N.D. Ohio Mar. 3, 2020). The Court held that the claimant had not met his burden to show a limitation under those circumstances. *Id.*

Here, of course, Mr. Cronican's counsel cross-examined the VE and elicited testimony that a standard office chair can support only up to 300 pounds. (Tr. 197–98.)

The Court in *Innocent* did go on to state, broadly, that "[e]ven if Plaintiff had established that his body weight exceeds what a standard workplace chair could hold, Plaintiff would still need more to meet his burden . . . ." *Id.* I view that statement as dicta, and the case the Court relied upon to support that statement is readily distinguishable from the case at bar.

In the cited case—*Holcomb v. Comm'r of Soc. Sec.*—the VE did not testify that a bariatric chair would be an accommodation and in fact testified that he had placed morbidly obese individuals in the jobs he specified in response to the ALJ's hypothetical questions. *Holcomb*, No. 1:18-CV-191, 2019 WL 1102250, *10 (N.D. Ohio Jan. 14, 2019), *report and recommendation adopted*, 2019 WL 1099548 (N.D. Ohio Mar. 8, 2019). The Court in *Holcomb* found relevant an

18

Eighth Circuit case, wherein the VE testified that bariatric chairs are, in fact, commonly provided to individuals in the workplace. *Id.* (quoting Higgins v. Commissioner, 898 F.3d 793, 796 (8th Cir. 2018)). The Court ultimately concluded that the VE's testimony established that the claimant was able to perform the work specified. *Id.* at *11.

Here, though, the VE *did* testify that providing a bariatric chair would be an accommodation. Further, there is no testimony here that providing that accommodation is common or that the VE had considered Mr. Cronican's morbid obesity in opining that he could perform the work of a policyholder information clerk, information clerk, mail clerk, or office helper. (*See* Tr. 195–96.) In fact, Mr. Cronican reported to a physician that his work would not provide him with a chair or desk. (*See* Tr. 635.)

I would expect a reasoned consideration of this issue on remand to include an inquiry into these matters if Mr. Cronican requires a bariatric chair. I would further expect inquiry into whether the number of jobs available to Mr. Cronican, if any, would be reduced if one assumes that the employer would have to provide a bariatric chair.

The remaining case cited by the Commissioner, *Strader v. Comm'r of Soc. Sec.* (an out-of-district opinion), is also distinguishable. There, the claimant did not elicit any testimony from the VE that the claimant needed a bariatric chair. *Strader*, No. 5:22-CV-367-M-BM, 2024 WL 796523, *10 (E.D.N.C. Feb. 2, 2024), *report and recommendation adopted*, 2024 WL 779225. Here, of course, Mr. Cronican's counsel elicited testimony establishing that a standard office chair could not hold Mr. Cronican's weight and that providing a heavy-duty chair would be an accommodation.

The Commissioner argues that no evidence "specific to him" establishes that Mr. Cronican needs a bariatric chair. But the ALJ's decision must be read with common sense. *E.g.*, *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010).

The ALJ concluded that Mr. Cronican must sit for four hours of every workday. The undisputed evidence shows that Mr. Cronican weighs close to 500 pounds. The VE established that standard work chairs cannot support people who weigh more than 300 pounds. Applying common sense, Mr. Cronican cannot use a standard work chair. *See also Joshua B. v. Comm'r of Soc. Sec.*, No. 2:19-cv-00436-LEW, 2020 WL 6376639, *4 (D. Me. Oct. 30, 2020) ("Although the commissioner attempts to frame the issue in medical terms of whether the decedent was functionally limited to a bariatric chair as a result of his impairment of obesity, . . . the issue is actually whether a typical workplace chair could have accommodated the decedent's size and weight, which is not a question of his functional ability so much as it is a question of the limitations of the chair."), *report and recommendation adopted*, 2020 WL 7395136.

Because that fact was established, it was error for the ALJ to fail to explain her consideration of whether a bariatric chair is required and, if it is, to explain her consideration of the effect (if any) on the jobs available to Mr. Cronican. I am convinced that remand is required for the Commissioner to further consider and explain these issues. *See Jordan v. Comm'r of Soc. Sec.*, No. 5:25-cv-964-JRA, 2025 WL 3237489, *10–12 (N.D. Ohio Nov. 20, 2025) (recommending reversal under similar circumstances) (report and recommendation pending review).

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court REVERSE the Commissioner's decision and REMAND this case to the Commissioner for further proceedings consistent with this Report and Recommendation.

  Dated:  December 22, 2025                          /s *Jennifer Dowdell Armstrong*
                                                     Jennifer Dowdell Armstrong
                                                     U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial

21

resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).